**Dr. James H. ABBS and Board of Regents of the University of Wisconsin System, as the governing body of the University of Wisconsin System, Plaintiffs,**

v.

**Louis SULLIVAN, Secretary of Department of Health and Human Services; National Institutes of Health; William Raub, Acting Director of National Institutes of Health; The Office of Scientific Integrity; Dr. Jules V. Hallum, director of Office of Scientific Integrity, Defendants.**

**No. 90–C–470–C.**

United States District Court, W.D. Wisconsin.

Dec. 28, 1990.

Carl E. Gulbrandsen, Waltraud A. Arts, Asst. Atty. Gen., Madison, Wis., for plaintiffs.

Marsha Edney, Dept. of Justice, Fed. Programs Branch, Washington, D.C., for defendants.

## OPINION AND ORDER

CRABB, Chief Judge.

This is a civil action brought pursuant to 28 U.S.C. §§ 1331 and 1346, in which the plaintiffs seek declaratory and injunctive relief. Plaintiffs contend that their rights to due process and equal protection have been or will be violated if defendants are allowed to continue their investigation into plaintiff Abbs's alleged scientific misconduct. They contend also that the policies

and procedures defendants are following are invalid.

Jurisdiction is present. The action arises under the laws and Constitution of the United States. 28 U.S.C. § 1331.

Presently before the court are plaintiffs' motions for a preliminary injunction and for partial summary judgment, and defendants' cross-motion for summary judgment. Also pending is defendants' motion to strike two articles attached as exhibits to an affidavit of Richard Bolton, one of plaintiffs' attorneys. I conclude that plaintiff Board of Regents has standing to challenge the procedures defendants are following; that neither of the plaintiffs has a legally cognizable liberty or property interest that implicates the due process clause; and that defendants are conducting their investigation of plaintiff Abbs under policies and procedures that are invalid because they were not promulgated in accordance with the requirements of the Administrative Procedure Act, to which they are subject. I conclude that the doctrine of administrative res judicata does not bar defendants from proceeding against plaintiff Abbs once they enact valid procedures. Accordingly, I will grant plaintiffs' motion for partial summary judgment with respect to the claim that the procedures followed by defendants in their investigation of plaintiff Abbs are invalid. I will grant defendants' motion for summary judgment on plaintiffs' claims that they are being denied due process and equal protection of the law by the investigation of plaintiff Abbs and that defendants are barred by administrative res judicata from investigating Abbs. With the resolution of the case on the merits, plaintiffs' motion for preliminary injunction becomes moot. Finally, I will grant defendants' motion to strike the exhibits attached to Bolton's affidavit because neither of the articles is admissible evidence.

From the parties' proposed findings of fact and supporting affidavits and documents, I find that there is no genuine issue with respect to the following material facts.

## FACTS

### A. The Parties

Plaintiff James H. Abbs is a professor of neurology and neurophysiology at the University of Wisconsin–Madison and is involved in research and related activities funded by the Public Health Service, a division of the United States Department of Health and Human Services.

Plaintiff Board of Regents of the University of Wisconsin System is a body corporate and agency of the State of Wisconsin. The Board is the governing entity of the institutions in the University of Wisconsin System including the University of Wisconsin–Madison and is the legal entity that applies for research grants.

Defendant National Institutes of Health is an agency within the Public Health Service. Its responsibilities include the coordination of the development and implementation of policies and procedures for dealing with misconduct in research and related scientific activities that are funded, conducted or regulated by the Public Health Service.

Defendant Louis Sullivan is the Secretary of the United States Department of Health and Human Services, a federal executive agency. He is responsible for overseeing, directing, implementing and administering the activities of NIH.

Defendant William Raub is the acting director of NIH. Defendant Jules V. Hallum is the director of the Office of Scientific Inquiry, which is an office within the Office of the Director of the NIH that oversees the implementation of all Public Health Service policies and procedures related to scientific misconduct, monitors individual investigations into alleged or suspected scientific misconduct by institutes that receive Public Health Service funds for biomedical and behavioral research projects, and conducts investigations as necessary.

### B. Background Events

In 1987, a committee of the University of Wisconsin–Madison conducted an inquiry into allegations that plaintiff Abbs had en-

gaged in scientific misconduct, specifically, that he had published certain curves in the journal *Neurology* that were traced from curves he had published previously, rather than being from two different patients as plaintiff represented. The university committee determined there was no need for a formal investigation into the allegations of scientific misconduct against Abbs and so advised NIH's Office of Extramural Research, in June 1987. (Before March 1989, the Office of Extramural Research of NIH carried out functions similar to those activities that are now the responsibility of the Office of Scientific Inquiry.) The Office of Extramural Research conducted additional inquiries into the Abbs matter and obtained a report from a panel of experts questioning the University of Wisconsin–Madison's prior determination that the allegations against Abbs did not warrant a formal investigation.

On January 12, 1990, the Acting Director of the Office of Scientific Inquiry advised plaintiff Abbs that his name and the fact that he was the subject of an investigation had been entered in the Public Health Service ALERT system, which serves to communicate information about investigations and final determinations of misconduct to all Public Health Service agencies.

On February 2, 1990, the Acting Director of the Office of Scientific Inquiry advised plaintiff Abbs that it was pursuing a formal investigation to determine whether he had engaged in scientific misconduct. As part of the investigation of plaintiff Abbs's alleged misconduct, a fact-gathering Office of Scientific Inquiry team met with Abbs to conduct an interview and afford him an opportunity to present additional information. On the advice of counsel, Abbs terminated the interview when he was informed he would not be allowed to be present during interviews of other witnesses and would not have complete access to the Office of Scientific Inquiry investigatory file.

### C. Investigation Proceedings

Under the Interim Procedures promulgated by the Public Health Service in 1986, an investigation by the Office of Scientific Inquiry into alleged misconduct may consist of a combination of activities, including a review of documents in the funding agency's possession; a review of documents at the awardee institution or elsewhere; a review of the investigative procedures followed by the awardee institution; inspection of laboratory or clinical facilities at the awardee institution; and interviews of those parties involved with or knowledgeable about the case.

A subject of an investigation has the opportunity to be interviewed by an Office of Scientific Inquiry team and to ask questions of the team; to review and comment on the transcript of his interview; and review and comment on the findings of the Office of Scientific Inquiry investigation and any proposed sanctions.

Prior to the completion of an investigation, the Public Health Service may take certain administrative actions including total or partial suspension of an award; suspension of eligibility for financial grants or contracts; restriction of certain research activities; requirement of special certification; more restrictive requirements for prior approval; deferral of a noncompeting grant; delay of a grant or contract award; and restriction or suspension of the use of the individual under investigation as an adviser or consultant to the agency.

If the investigation confirms misconduct, the Office of Scientific Inquiry team may recommend imposing sanctions that range in severity. "Group I sanctions" include issuing a letter of reprimand; imposing a requirement for special approval of activities as a condition of an award; or requiring supervision or oversight of scientific activities. Group II sanctions are more severe. They include placing restrictions for a specified time period on activities under an active award; requiring special reviews of requests for funding; and prohibiting for a specified period of time participation on peer review committees, advisory groups, or other related Public Health Service activities. Group III sanctions, the most severe, may include immediate suspension or termination of an active award; withholding specific future non-competing

grants or contracts; and debarment or suspension of the individual for a specified period of time, in other words, declaring the person ineligible for participation in Public Health Service grants, cooperative agreements or contracts. Any of these sanctions may be imposed at the discretion of the Public Health Service with the exception of debarment or suspension, for which a recommendation is forwarded to the Deputy Assistant Secretary for Procurement, Assistance, and Logistics, Department of Health and Human Services.

Persons receiving notice of proposed debarment or suspension have an opportunity to submit information and arguments in writing before action is taken. If the information raises a genuine issue of material fact, the person is afforded an opportunity to appear at a hearing with a representative, submit documentary evidence, present witnesses, and confront any witness the agency presents. The hearing is reported and a transcript is available.

Findings of scientific misconduct and all approved sanctions are published in the Federal Register. Additionally, the Public Health Service may disseminate the findings to other federal agencies, non-federal agencies or organizations, scientific review groups and national advisory boards.

### D. Adoption of Procedures

The procedures and policies utilized in the investigation of Abbs's alleged scientific misconduct were adopted by the Public Health Service as interim procedures in 1986 pursuant to 42 U.S.C. § 289b. These procedures were first described in a July 18, 1986 special issue of an NIH publication entitled *Guide for Grants and Contracts—Policies and Procedures for Dealing with Possible Misconduct in Science.* In pertinent part, they provide that when a report of possible misconduct is received by the Public Health Service, or one of its

agencies, or an awardee institution, the funding agency or awardee institution shall conduct an inquiry to determine whether a formal investigation is warranted. If an agency determines that an investigation is to be initiated, it must notify the individuals or the institutions that are to be investigated. "Misconduct" is defined as

(1) serious deviation, such as fabrication, falsification, or plagiarism, from accepted practices in carrying out research of in reporting the results of research; or (2) material failure to comply with Federal requirements affecting specific aspects of the conduct of research—e.g., the protection of human subjects and the welfare of laboratory animals.

The responsibilities of Public Health Service agency officials include such matters as deciding whether interim administrative actions should be taken to protect federal interests during an investigation; deciding whether to insert the record of an individual or institution under investigation into the ALERT system; searching the records to determine whether the individual or institution is under investigation so that other awarding components within the agency may be notified, if appropriate; and taking steps to initiate or impose appropriate sanctions upon completion of an investigation that confirms misconduct.

The Interim Procedures also set forth the activities that are to make up an investigation; the procedures that will be followed when the investigative findings confirm misconduct; and the interim and final sanctions that can be imposed upon subjects of an investigation.

The Interim Procedures became part of the Public Health Service Grants Administration Manual on September 1, 1988, as noted in 54 Fed.Reg. 32,446 (1989). They have never been published in the Federal Register.[1] The Public Health Service

---

1. Defendants propose as a fact that these policies and procedures were *published* on July 18, 1986 in the Federal Register and cite 54 Fed. Reg. 32,446 (1989). At page 32,446, the only reference to the Public Health Service policies and procedures at issue is a statement in the

Supplementary Information section that states in full:

> The PHS has adopted interim policies to provide guidance for dealing with allegations and investigations, based on experience with a number of cases. These interim policies were published for the information of the public in

did not provide any opportunity for comment by persons likely to be affected by the policies and procedures before it adopted the procedures in 1986.

In July 1990, the Public Health Service promulgated what it refers to as the Final Version of the Policies and Procedures for Dealing with Possible Misconduct in Extramural Research.

### E. Public Health Service Grants

Currently, there are in effect two grants in excess of $2,000,000 awarded to plaintiff Board of Regents by NIH on which plaintiff Abbs is the principal investigator. Abbs is the director of a unique national shared X-ray laboratory funded by NIH grants.

Plaintiff Board of Regents has applied to NIH for a five-year grant with Abbs as the principal investigator. Also, the Board has applied for an administrative supplement for a three month extension of NIH grant # 5 P50DC00162–10, one of the grants on which Abbs is working as the principal investigator. Defendants have paid for the first month and are considering the request for an additional two months of funding.

For the fiscal year ending June 22, 1990, the Public Health Service granted the Board of Regents over $75,000,000 for research at the University of Wisconsin–Madison. On July 23, 1990, 291 principal investigators at the university were receiving federal research or training grants from NIH. Forty-four per cent of the funding awarded by NIH is allowed for indirect costs incurred by the awardee institution, such as for space, depreciation and libraries.

Almost all biomedical research is federally funded.

### OPINION

### A. Standing

■ A threshold issue is whether, as defendants contend, plaintiff Board of Re-

gents lacks standing to challenge any aspect of the investigation of plaintiff Abbs because it cannot demonstrate any actual or threatened injury as a result of defendants' conduct.

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1974). A litigant must show the existence of an actual case or controversy within the meaning of Art. III of the Constitution, which means that he or she must allege " 'an actual injury redressable by the court.' " *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 39, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)). This is intended to ensure sharply focused adversarial positions and to avoid the issuance of advisory opinions.

> The requirement that a party seeking review must allege facts showing that he is himself adversely affected ... does serve as at least a rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome.

*Sierra Club v. Morton*, 405 U.S. 727, 740, 92 S.Ct. 1361, 1368–69, 31 L.Ed.2d 636 (1972).

■ Standing to challenge the action of a federal agency requires a showing that the challenger has suffered an injury in fact and that Congress did not intend to foreclose judicial review to the class to which the litigant belongs. *Block v. Community Nutrition Institute*, 467 U.S. 340, 345–46, 104 S.Ct. 2450, 2453–54, 81 L.Ed.2d 270 (1984) (citing *Barlow v. Collins*, 397 U.S. 159, 173, 90 S.Ct. 832, 841–42, 25

the July 18, 1986, issue of the "NIH Guide for Grants and Contracts" and became part of the PHS Grants Administration Manual on September 1, 1988.

This reference in 54 Fed.Reg. 32,446 to an earlier publication of the policies and procedures of

the Public Health Service in an agency publication does not support defendants' proposed finding that the policies and procedures were published in the Federal Register.

L.Ed.2d 192 (1970) (opinion of Brennan, J.); *Data Processing Service v. Camp,* 397 U.S. 150, 156, 90 S.Ct. 827, 831, 25 L.Ed.2d 184 (1970)).

The starting point is injury. The Board of Regents contends that, as the entity with "legal and financial accountability for the awarded funds and for the performance of the supported activities," 42 C.F.R. § 50.102, it faces a clear prospect of actual injury as a result of an inaccurate determination of Abbs's scientific conduct, which can occur if Abbs is not provided the full procedural protections that he is due. The Board argues that

[o]ver forty percent of this $2,000,000 [grant] goes to pay the overhead costs incurred by the Board in providing facilities for the research done by Dr. Abbs and others pursuant to the terms of the grants in question. In addition, the Board has made significant commitments to employes other than Dr. Abbs in reliance on the approved, current funding of these grants. A determination of misconduct by OSI in accordance with improperly promulgated and unconstitutional procedures realistically threatens these current funds and would have a direct economic impact on the Board.

Board's Brief in Opposition to Defendants' Motion for Summary Judgment at 6.

The Board maintains that it is not mere speculation to think that defendants might terminate or suspend the grants on which Abbs is the principal investigator: the Public Health Service policies provide specifically that total or partial suspension of an award is an interim administrative action that may be taken during the investigation of scientific misconduct. Final Version, Public Health Service Policies and Procedures for Dealing with Possible Misconduct in Extramural Research [Exh. D to affidavit of Suzanne Hadley, 7/27/90] at 31–32 (July 25, 1990). Additional interim sanctions can include deferral of funding of noncompeting grants and delay in awarding a competing grant. *Id.* at 35–36.

Defendants dispute the Board's claim that it faces an actual or even a threatened injury. They argue that (1) only plaintiff Abbs is the subject of the current investigation, and the Board is not; (2) a finding that Abbs engaged in misconduct would not cause the Board to lose the funding for the grant on which he is the principal investigator because the Board could substitute another principal investigator with the approval of NIH; and (3) no interim actions have been taken in this case although the misconduct allegations are three years old.

Defendants argue also that the Board's claim is not ripe for review: no action has been taken by defendants; the matter is still in the investigatory stage with no final decision having been reached; Abbs may be found innocent of any wrongdoing, in which case no sanctions will be imposed; and in the event the sanction of termination of an ongoing grant is recommended, the Board will have an opportunity for a formal evidentiary hearing.

None of defendants' arguments is persuasive. The Board is the entity with legal and financial responsibility for the NIH funds and for the performance of the federally-funded research and training activities. It is also Abbs's employer and thus responsible for paying his salary. If Abbs has difficulty obtaining research funding, the Board will not be reimbursed for that salary, as it is now. The Board has a definite financial stake in the accuracy and fairness of the procedures used by NIH to determine misconduct by the University of Wisconsin–Madison researchers for whom the Board is to be held responsible.

There is little force to the argument that the Board has no standing because defendants have not taken any interim actions, in view of the fact that defendants have not waived their right to take such actions if they uncover additional, more serious information during their investigation of Abbs. Defendants have already taken the interim action of placing Abbs's name in the ALERT system to alert funding agencies within the Public Health Service to his alleged misconduct. It is not mere speculation to think that the placement of his name in that system will lead to delays in approval of funding requests for research on which he is the principal investigator;

indeed, it would be difficult to argue that the system is working properly if it did not lead to such delays. Any delay in funding affects the Board adversely because it is responsible for maintaining the facilities and paying the personnel that it has committed to the research project.

The fact that the Board has an opportunity to substitute a principal investigator on a grant if the original investigator is prohibited from working on it does not mean that the Board will not incur any injury. Defendants' argument to that effect is based on two assumptions: that the Board will be able to find another scientist in a position to take over the work *and* that it will be able to gain the approval of NIH for the substitution. In actuality this may not be possible. Even if it is, it is reasonable to assume that making that substitution and obtaining approval for it from NIH are not cost-free actions for the Board. Nor are lesser sanctions cost-free, if it means having to employ additional personnel or divert existing personnel from other tasks to ensure that Abbs is supervised in his activities, for example, or to monitor his research.

The fact that Abbs might ultimately be cleared of the accusations against him does not obviate the Board's concerns about the manner in which the investigation is conducted. That argument is as unconvincing as arguing that persons charged with felonies have no cognizable interest in the trial procedures afforded them because they might be acquitted.

In order to establish standing to sue, the Board does not need to show it has a legally protected property or liberty right that is being invaded. "The 'legal interest' test goes to the merits. The question of standing is different." *Data Processing Service v. Camp,* 397 U.S. at 153, 90 S.Ct. at 830. It is not necessary, either, to show that a large amount is at stake.

"The basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation." Davis, Standing: Taxpayers and Others, 35 U.Chi.L.Rev. 601, 613. See also K. Davis, Administrative Law Treatise, §§ 22.09–5, 22.09–6 (Supp. 1970).

*United States v. SCRAP,* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973). *See also Pennell v. City of San Jose,* 485 U.S. 1, 108 S.Ct. 849, 855, 99 L.Ed.2d 1 (1988) (likelihood of enforcement of city ordinance limiting rent increases in certain circumstances, "with concomitant probability that a landlord's rent will be reduced below what he or she would otherwise be able to obtain in the absence of the Ordinance," is sufficient threat of actual injury to satisfy standing requirement); *Apter v. Richardson,* 510 F.2d 351 (7th Cir.1975) (unsuccessful applicant for NIH grant has standing to challenge denial of application on First Amendment grounds; 800 hours of preparation for grant and loss of anticipated economic and professional benefits constitute injury).

The Board meets the test articulated in *Block v. Community Nutrition Institute,* 467 U.S. 340, 104 S.Ct. 2450. Nothing in 42 U.S.C. § 289b suggests that Congress intended to foreclose institutional entities such as the Board of Regents from participating in the development of the law relating to investigation of scientific misconduct. To the contrary, it is reasonable to assume that Congress would have intended that grantee institutions could be relied upon to challenge agency disregard of fair and accurate procedures for ferreting out scientific misconduct. *Id.* at 347, 104 S.Ct. at 2454–55.

I conclude that the possibility that one of the Board's principal investigators will be declared to have engaged in scientific misconduct through inaccurate and unfair procedures and the consequent financial effect upon the Board are sufficient to show that the Board faces a threat of actual, redressable injury that satisfies the standing requirement. There is no evidence that Congress did not intend that grantee institutions such as the Board did not constitute a class of plaintiffs that could challenge agency disregard of the law.

## B. Due Process Rights

Both plaintiffs contend that they have liberty and property interests at risk in any determination of Abbs's alleged misconduct and that these interests implicate the due process clause of the Fifth Amendment to the United States Constitution. In plaintiffs' view, their liberty and property interests entitle them to an opportunity to confront plaintiff Abbs's accusers and to rebut the evidence against him before he is put on the ALERT system or labeled as being "investigated for scientific misconduct." They argue that before any determination of misconduct is made, the Office of Scientific Inquiry should be required to provide a hearing for Abbs at which the decision would be made upon a defined record, and at which Abbs would have the right to call witnesses, cross-examine defendants' witnesses, and review and have a chance to rebut the evidence gathered by the office.

Defendants contest plaintiffs' assertion of legally cognizable liberty and property interests. They argue also that even if plaintiffs do have such interests, which they dispute, the procedures provided plaintiff Abbs are sufficient under the due process clause. These procedures include an opportunity for an interview and to ask questions of the investigating team, to comment on the transcript of the interview, and review and comment on the investigation's findings and any proposed sanctions. Defendants deny that Abbs is entitled to anything more elaborate in the way of procedures. They deny specifically that he is entitled to procedural protections that meet the requirements of the Administrative Procedure Act.

### 1. Property Interest

■ The Constitution's "procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Board of Regents v. Roth*, 408 U.S. 564, 576, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548 (1972). The property interest itself is not created in the Constitution, but is "defined by existing rules or understandings that stem from an independent source such as

state law." *Id.* at 577, 92 S.Ct. at 2709. A claimant must show more than an abstract need, desire or unilateral expectation to a benefit to establish an interest subject to due process protections. *Id.* at 577–78, 92 S.Ct. at 2709–10. *See, e.g., Wolf v. Larson*, 897 F.2d 1409 (7th Cir.1990) (village clerk had no legitimate expectation of retaining her salary for her work as village collector when village had authority to reduce salary for village collector's job at any time); *Weinstein v. University of Illinois*, 811 F.2d 1091 (7th Cir.1990) (untenured professor working under contract that specified he had no expectation of renewal has no property interest in his position); *Munson v. Friske*, 754 F.2d 683 (7th Cir.1985) (temporary employee has no protected property right in his job unless he can show that his employer is bound by contract or statute to retain him).

#### a. Plaintiff Abbs

■ Plaintiff Abbs contends that he has a constitutionally protected property interest that derives from the interrelationship of federal funding with his career advancement and income. He asserts that he will suffer a loss of income and a loss of opportunities for professional advancement if federal funding is taken from him or becomes more difficult to obtain. As important as such funding is to plaintiff Abbs, however, it does not constitute a constitutionally protected property interest unless his claim to it is legally enforceable by contract or under state or federal law.

As to future federal funding, plaintiff Abbs has no enforceable right to receive grants or awards, whatever his status as a researcher. Such funding is always discretionary with the funding agency. As to the current grants, he is not the grantee and can claim no property rights in the funding for these grants. Pursuant to 45 C.F.R. Part 74, the plaintiff Board of Regents is the grantee of the awards and the entity that has the legal and financial responsibility for the grant funds and that bears the initial costs of paying for personnel, space and facilities. There is no evidence that Abbs would incur any personal financial

injury if current funding for his research were suspended or terminated.

Plaintiffs have proposed no facts from which I could find that Abbs is at risk for losing any funds previously committed to him for any purpose or incurring any injury as a result of such a loss or that he has a contractual or otherwise enforceable claim to future federal funding. Without such a showing I cannot find that he has anything but a unilateral expectation of continued federal funding for research, which, as *Roth* makes clear, does not give rise to a constitutionally protected property interest.

■ Plaintiff Abbs argues that even if he is not the grantee of the funds, he has a protectible interest in them arising from his status as the intended beneficiary of the funding. He cites *Holbrook v. Pitt*, 643 F.2d 1261 (7th Cir.1981) for the proposition that third-party beneficiaries of a contract may have a protectible interest under the contract. In *Holbrook*, the contract at issue was entered into for the direct benefit of the tenants eligible for housing assistance payments for low income housing. Abbs's situation is different. The grant awards made to the Board of Regents are not made for his benefit, but for the benefit of the public that may enjoy the fruits of his research.

In *Northlake Community Hosp. v. United States*, 654 F.2d 1234 (7th Cir.1981), the court of appeals held that although Medicare providers are not the intended beneficiaries of Medicare contracts, they have a sufficient interest in maintaining their provider agreements to entitle them to certain posttermination procedures. The court did not discuss the nature of the providers' property interest or its source, but has since cited the case as holding that a Medicare provider has a property interest in its agreement with the government. *Continental Training Services, Inc. v. Cavazos*, 893 F.2d 877, 893 (7th Cir.1990). Presumably that interest stems from the financial investment the providers have in their facilities, staffs, and office operations. If so, *Northlake* might provide support for the Board of Regents' claim to a cognizable property interest. It supplies no support for plaintiff Abbs because he has not shown any financial stake in the current grants.

■ Finally, Abbs makes the argument that if the government grants a person "a right or expectation that adverse action will not be taken against him except upon the occurrence of specified behavior, 'the determination of whether such behavior has occurred becomes critical, and the minimum requirements of procedural due process appropriate for the circumstances must be observed.'" *Vitek v. Jones*, 445 U.S. 480, 490–91, 100 S.Ct. 1254, 1262, 63 L.Ed.2d 552 (1980) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 2975–76, 41 L.Ed.2d 935 (1974)). Plaintiff argues that the existence of the statutory and regulatory framework relating to investigations of scientific misconduct gives every person a right not to be labeled as having committed scientific misconduct without a determination that such misconduct has occurred, and that the creation of this right requires the government to provide due process protections.

Plaintiff does not develop this argument, and it is an unusual one for him to make in light of his vigorous challenge to the inadequacy of the procedures provided him. My own review of the defendants' procedures does not disclose the substantive rules of entitlement that are necessary to change procedures into property interests. *See, e.g., Olim v. Wakinekona*, 461 U.S. 238, 248–51, 103 S.Ct. 1741, 1747–49, 75 L.Ed.2d 813 (1983); *Weinstein v. University of Illinois*, 811 F.2d at 1097; *Shango v. Jurich*, 681 F.2d 1091, 1101 (7th Cir.1982).

At most, the government could be said to have created "rights" for its awardees that entitle them not to be barred from competing for future government grants and not to lose current grant funding without due process. These are the benefits that cannot be taken away without a determination of cause made after a full hearing. The lesser sanctions and the interim actions that plaintiffs are challenging are not subject to any such determinations, but may be

imposed within the essentially unfettered discretion of defendants.

### b. *Plaintiff Board of Regents*

■ As a general rule, the Board of Regents would be precluded from raising a due process challenge against the federal government. As an agency of the State of Wisconsin, the Board is entitled to no due process protections with respect to actions by the federal government. *South Carolina v. Katzenbach*, 383 U.S. 301, 323–24, 86 S.Ct. 803, 815–16, 15 L.Ed.2d 769 (1966) (the word "person" in context of due process clause does not encompass states). However, the Public Health Service regulations implementing grant administration treat state agencies governing public institutions of higher learning as nongovernmental entities for purposes of grant administration. 45 C.F.R. § 74.3.

■ The Board contends it has a property interest in current grants and in noncompeting applications and noncompeting extensions. Its asserted property interest in plaintiff Abbs's current grants is based on the commitments the Board has made to NIH in connection with the grants that are funding plaintiff Abbs's research, under which it has agreed to abide by certain terms and conditions of the grant and in return is guaranteed the funds that the Public Health Service has committed for the approved budget period. Its asserted property interest in extension funding for the X-ray microbeam laboratory rests on the fact that the application is for a noncompeting extension under the Public Health Service's grants administration procedure that does not compete with other projects and can be granted administratively.

Whatever commitments the Board of Regents has made to the X-ray microbeam laboratory, and however critical continued federal funding is to the Board's support of the laboratory, the Board does not have a legally enforceable right to future funding for the laboratory that would give it a constitutionally protected property interest.[2] Although the Board argues that such grants are awarded "essentially automatically," 42 C.F.R. § 52.6(b)(3) provides explicitly that "[n]either the approval of any application nor the award of any grant commits or obligates the United States in any way to make additional, supplemental, continuation or other award with respect to any approved application or part of an approved application." In the light of this regulatory language, it cannot be said that even noncompeting continuation grants are legally enforceable by the grantee.

■ The Board does have a protected property interest in the funding already in place. If there is a reasonable possibility that previously committed funds will be terminated or subjected to recoupment as a result of the investigation of Abbs, the Board has a right to procedural due process protections. Defendants contend that there is no likelihood that any current grants will be terminated or suspended as a result of the investigation. More important, argue defendants, if there were a threatened suspension or termination of any current grant, the Board would have the due process protections of the termination procedures set out in 45 C.F.R. § 74.115, as well as the NIH appeals procedures at 42 C.F.R. Part 50, Subpart D and the Health and Human Services appeals procedures at 45 C.F.R. Part 16, none of which have been challenged by plaintiffs as being inadequate.

I conclude that, because the only arguable property interest the Board has is in its current grants on which Abbs is the principal investigator, and because adequate procedures exist to protect the Board in the event of termination or suspension of funding, the Board has no cognizable property interest at risk in the investigative proceedings against Abbs.

### 2. Liberty Interest

### a. *Plaintiff Abbs*

Plaintiffs devote the major portion of their arguments to what they characterize

---

**2.** That the Board has a potential financial injury from denial of its requests for future funding sufficient to give it standing to challenge the defendants' procedures does not mean that the Board has a protected property interest entitling it to due process.

as plaintiff Abbs's liberty interest in continued funding, in continued good standing as a researcher of national renown, and in maintaining his personal and scientific reputation. Their arguments leave no doubt that the proceedings are having a significant impact upon Abbs, but they do not establish that the proceedings are depriving him of a liberty interest as that term has been defined and narrowed by the United States Supreme Court.

Plaintiffs assert that plaintiff Abbs faces labeling that will stigmatize him professionally and will result in his being effectively precluded from participation in professional activities critical for career advancement, such as membership on professional committees, performing peer reviews and reviews of manuscripts, nomination for and receipt of awards. They assert as well that funding for research projects will not be available for a scientist found to have engaged in misconduct, and that without such funding, a scientist would be unable to function effectively.

 Plaintiffs acknowledge that "mere" defamation, however personally devastating it may be to the subject, is not a deprivation of liberty for which due process protections are constitutionally guaranteed. Apart from some more tangible interest such as the freedom to pursue a calling or profession, reputation alone does not implicate any property or liberty interests sufficient to invoke the protections of the due process clause. *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160–61, 47 L.Ed.2d 405 (1976); *Lawson v. Sheriff of Tippecanoe County, Ind.*, 725 F.2d 1136, 1138 (7th Cir.1984); *Elbert v. Board of Educ.*, 630 F.2d 509, 512–14 (7th Cir.1980), *cert. denied*, 450 U.S. 1031, 101 S.Ct. 1741, 68 L.Ed.2d 226 (1981).

To rise to the level of a cognizable wrong, defamation must be accompanied by something more: at the very least, an alteration in legal status. *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) (statutorily mandated posting of individual's name as person not permitted to purchase liquor altered her status as well as defaming her and justified

procedural protections). Defamation by the state accompanied by termination from a job or by demotion to a significantly lower paying and "degradingly inferior" job requires procedural protections because the state's action is essentially that of excluding the fired or demoted employee from her trade or calling. *Lawson*, 725 F.2d at 1139. Since the concept of liberty in the Constitution includes the freedom to follow a trade, profession, or other calling, the state cannot act in a way that has the effect of excluding a person from her occupation without providing due process.

"When a state fires an employee for stated reasons likely to make him all but unemployable in the future, by marking him as one who lost his job because of dishonesty or other job-related moral turpitude, the consequences are so nearly those of formally excluding him from his occupation that the law treats the state's action the same way, and insists that due process be provided." *Lawson*, 725 F.2d at 1139. *See also Old Dominion Dairy v. Sec'y of Defense*, 631 F.2d 953 (D.C.Cir.1980) (corporation had cognizable liberty interest in federal government determination that company "lacked integrity, which had an immediate and devastating effect on its ability to do business with the government").

 The stumbling block for plaintiff Abbs is his failure to show that he will be excluded from his profession by defendants' actions. He does not allege that his university employment is at risk; he does not face the likelihood of termination from his job. If he were declared ineligible for future federal funding, he *might* be prevented from carrying out the essential functions of his job as it is presently constituted. If that were to be recommended, however, he would be entitled to a full hearing. Under the applicable NIH procedures, defendants can not bar plaintiff Abbs from future funding without providing him with a hearing that comports with due process.

Plaintiffs have not shown that Abbs is suffering or will suffer an alteration in any status secured by state or federal law. His

ability to serve on committees, to review journal articles, to participate in peer review, to conduct his research without supervision or special reporting obligations is not a right that is protected by law. Thus, any interference with that ability does not amount to an alteration of a legal status. *See Illinois Psychological Ass'n v. Falk*, 818 F.2d 1337 (7th Cir.1987) (potential loss of hospital staff membership constituted curtailment, but not loss, of occupational liberty where psychologists retained their licenses to practice as well as hospital privileges); *Goulding v. Feinglass*, 811 F.2d 1099 (7th Cir.), *cert. denied*, 482 U.S. 929, 107 S.Ct. 3215, 96 L.Ed.2d 701 (1987) (defamatory remarks made about tax lawyer by IRS to lawyer's clients did not implicate liberty interest because they did not foreclose lawyer from practicing law, although they may have made him less attractive to clients).

I conclude that plaintiff Abbs does not have a constitutionally protected liberty interest at stake in the investigation of his alleged misconduct.

### b. *Plaintiff Board of Regents*

■ The Board argues that an institution's liberty interests are implicated by governmental action that deprives the institution of the freedom to engage in an important activity such as conducting research and competing for funding on the merits of its research applications and renewal requests with other applicants. The Board contends that defendants took actions affecting the Board's liberty interests when they put the Board at risk for placement in the "PHS ALERT" system without giving the Board an opportunity to contest the allegations that give rise to such placement.

In support of its argument, the Board cites cases holding that government contractors have liberty interests that entitle them to some measure of due process if they are denied government contracts on the basis of charges of fraud or dishonesty. *See, e.g., Transco Security, Inc. of Ohio v. Freeman*, 639 F.2d 318, 321 (6th Cir.1981), *cert. denied*, 454 U.S. 820, 102 S.Ct. 101, 70 L.Ed.2d 90 (1981) (government contractors cannot be barred from dealing with government whether by suspension or debarment without provision of procedural safeguards); *Old Dominion Dairy Products, Inc.*, 631 F.2d 953 (determination that company lacked integrity and denial of contract for supply of dairy products to military held to be unconstitutional when company not provided notice and opportunity to be heard on determination); *Gonzalez v. Freeman*, 334 F.2d 570 (D.C.Cir.1964) (Department of Agriculture could not suspend contractor for five years unless department had promulgated procedure notifying contractors of their rights).

Defendants contest the Board's assumption that it will be denied the opportunity to apply for and be awarded research grants if Abbs is found to have engaged in scientific misconduct, as well as the Board's assertion that it, and not just Abbs, has been placed in the ALERT systems without determining the accuracy of those assertions.

I conclude, nonetheless, that the Board has failed to establish that its important interest in continuing to engage in federally funded scientific research is at risk in the investigation of Abbs. As discussed in Section A(2) above, the Board *is* entitled to full due process protections if the results of the Abbs investigation lead to a recommendation of suspension of current funding or preclusion of the Board from future funding. These protections exceed those required for government contractors in *Transco*, 639 F.2d 318, *Old Dominion Dairy*, 631 F.2d 953, or *Gonzalez*, 334 F.2d 570.

### C. *Plaintiff Abbs' Right to Equal Protection*

■ Plaintiff Abbs argues that he has been denied equal protection by being treated differently from researchers working under grants from the Food and Drug Administration and from health care providers. The argument is flawed from the beginning. To state an equal protection violation, a plaintiff must show that he or she is treated differently from others who

are similarly situated. Plaintiff Abbs does not even suggest that he is treated differently from other researchers working under grants from the Public Health Service.

### D. Administrative Procedures Act

#### 1. Applicability of Act

The Administrative Procedures Act, 5 U.S.C. §§ 551, *et seq.*, requires federal agencies involved in rulemaking to promulgate rules as provided in the Act. 5 U.S.C. § 553(b) requires that a federal agency must give notice of a proposed rule by publishing it in the Federal Register at least 30 days prior to adopting the rule. The notice must include:

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

*Id.* In addition to giving notice, the agency "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments...." 5 U.S.C. § 553(c). These rule-making provisions were enacted to assure "fairness and mature consideration of rules of general application." *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969).

The notice and comment requirements are necessary to "allow public participation in the promulgation of rules which have a substantial impact on those regulated." *National Retired Teachers Ass'n v. U.S. Postal Service*, 430 F.Supp. 141, 147 (D.D.C.1977), *aff'd*, 593 F.2d 1360, (D.C.Cir. 1979). This duty to inform affected persons and allow them an opportunity to comment on proposed rules serves the basic policy of fairness underlying the Act, and assures that the agency promulgating the rules "will have before it the facts and information relevant" to making an informed decision. *National Ass'n of Home Health Agencies v. Schweiker*, 690 F.2d 932, 949 (D.C.Cir.1982), *cert. denied*, 459 U.S. 1205, 103 S.Ct. 1193, 75 L.Ed.2d 438 (1983).

The Public Health Service is not exempt from the requirements of the Administrative Procedures Act. It is required to promulgate agency rules according to the Act's provisions, which include publishing notice of any proposed rules in order to invite comment from those persons who are likely to be regulated by the rules the agency seeks to adopt.

 Defendants do not contest the application of the APA to agency *rules*. However, they contend that the Public Health Service *procedures* for handling investigations of alleged scientific misconduct are not agency rules. Their contention does not withstand close analysis.

The definition of "rule" as set forth in 5 U.S.C. § 551(4) has three distinct elements:

(1) it is the whole or part of any agency statement;

(2) of general or particular applicability and future effect;

(3) designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency.

The scientific misconduct investigation guidelines include each of the elements that constitute a "rule." They were issued as part of an agency statement. The guidelines are applicable prospectively to a class of NIH grant recipients generally, and to the named plaintiffs particularly. Finally, they describe the Public Health Service procedures. *See* 1986 NIH Guide for Grants and Contracts; 1988 Public Health Service Contract Administration Manual.

#### 2. Exceptions to APA Rulemaking Requirements

Defendants argue that even if the procedures for handling scientific misconduct cases are subject generally to the rulemaking provisions of the APA, they fall within specific exceptions contained in the Act that provide exemptions from the notice and comment requirements.

■ In reviewing defendants' argument, I start with the proposition that exceptions to the rulemaking provisions are to be narrowly applied so as not to defeat the purposes of fairness to those persons affected by the rules and of agency self-education. *National Ass'n of Home Health Agencies*, 690 F.2d at 948. When Congress enacted the APA, its expectation was that exceptions would be narrowly construed. The notice and comment requirement "was one of Congress's most effective and enduring solutions to the central dilemma it encountered in the APA—reconciling the agencies' need to perform effectively with the necessity that 'the law must provide that the governors shall be governed and the regulators shall be regulated, if our present form of government is to endure.' " *New Jersey v. United States Environmental Protection Agency*, 626 F.2d 1038, 1045 (D.C.Cir.1980).

The limited exceptions to the rulemaking provisions of the APA are set out in § 553, which provides, in pertinent part:

(a) This section applies, according to the provisions thereof, except to the extent that there is involved—

(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

(b) General notice of proposed rule making shall be published in Federal Register....

Except when notice or hearing is required by statute, this subsection does not apply—

(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice.

■ Defendants argue that the Public Health Service rules on investigations of alleged scientific misconduct involve matters relating to agency management and as such are an exception under § 553(a)(2) to the rulemaking provisions of the APA. This argument overlooks the "Statement of Policy" published in the Federal Register on January 28, 1971, in which the Secretary of the Department of Health and Human Services waived this exception to the general rule requiring notice and comment and directed all agencies to utilize the rulemaking provisions of the APA when issuing rules and regulations relating to public property, loans, *grants*, benefits or contracts. 36 Fed.Reg. 2532 (1971). As part of this "Statement of Policy," the Secretary acknowledged that, although the APA permits exceptions to the notice and comment provision when the agency finds for good cause that such procedures would be impractical, unnecessary or contrary to the public interest, such exceptions "should be used sparingly, as for example in emergencies and in instances where public participation would be useless or wasteful because proposed amendments to regulations cover minor technical matters." *Id.*

As a result of this voluntary election by the Secretary to abide by the rulemaking provisions of the Act, courts have held the Department of Health and Human Services to strict compliance with the notice and comment requirements when promulgating regulations. *See, e.g., Herron v. Heckler*, 576 F.Supp. 218, 229 (N.D.Cal.1983) (Statement of Policy legally binds the Secretary to the provisions of the APA.) *See also Lewis v. Weinberger*, 415 F.Supp. 652, 661 (D.New Mex.1976); *State of Florida v. Weinberger*, 401 F.Supp. 760, 761 (D.D.C. 1975). The investigation guidelines are not excepted from the notice and comment provisions under § 553(a)(2) of the APA.

■ Defendants contend also that the guidelines are procedural rules exempt under § 553(b)(A) from the notice and comment provisions of the APA. Although an agency's label is relevant, it is not dispositive of the true character of the agency statement. *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1984). *See also Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 416, 62 S.Ct. 1194, 1200, 86 L.Ed. 1563 (1942) (particular label placed on action by Federal Communications Commission is not necessarily conclusive; "it is the substance of what the Commission has purported to do and has done which is decisive").

Almost all agency "procedures" will affect the public in some way. "[E]ven office hours ... necessarily require conformity on the part of the public." E. Freund, Administrative Powers over Persons and Property, 213 (1928) (quoted in *Batterton v. Marshall*, 648 F.2d 694, 707 (D.C.Cir. 1980)). "A useful articulation of the exemption's critical feature is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which parties present themselves or their viewpoints to the agency." *Batterton*, 648 F.2d at 707. The exception does not apply to " 'those procedural rules that depart from existing practice and have a substantial impact on those regulated.' " *National Ass'n of Home Health Agencies*, 690 F.2d at 949 (quoting *Brown Express, Inc. v. United States*, 607 F.2d 695, 702 (5th Cir.1979)). If a so-called procedure "trenches on substantial rights and interests," it is not exempt from the requirements of § 553. *Batterton*, 648 F.2d at 708. *See also Pharmaceutical Manufacturers Ass'n v. Finch*, 307 F.Supp. 858, 863 (D.Del.1970) (notice and comment necessary "when a proposed regulation of general applicability has a substantial impact on the regulated industry, or an important class of the members or the products of that industry.")

The Public Health Service scientific misconduct investigation guidelines promulgated in 1986 (the "Interim Procedures") allow the imposition of temporary sanctions on individuals and institutions, such as plaintiffs, who are subjects of investigations into alleged scientific misconduct.[3] They permit the agency to impose permanent sanctions on individuals and institutions found guilty either of engaging in scientific misconduct or permitting it to occur that can result in great damage to the reputations of individuals and institutions, even if they do not implicate property or liberty interests protected by the Consti-

tution. There is no doubt that the sanctions that can be imposed have a substantial impact on those persons subject to the guidelines. This effect upon the persons regulated implicates the basic policy considerations of fairness and informed agency decision making for which Congress enacted the notice and comment provisions of the APA and makes the exemption in § 553(b)(A) inapplicable.

I conclude that the Public Health Service Interim Policies and Procedures for Dealing with Possible Misconduct in Extramural Research adopted in 1986 are agency rules subject to the rulemaking provisions of the Administrative Procedures Act including notice and comment requirements, and that, because the rules at issue were not properly promulgated, they are invalid unless and until they are promulgated in compliance with the procedures required by the APA.

### E. Administrative Res Judicata

█ Plaintiffs allege that defendant National Institutes of Health reached a decision in 1987 agreeing with the conclusions of the University of Wisconsin–Madison Inquiry Committee that the charges of scientific misconduct against plaintiff Abbs had not been substantiated. Plaintiffs contend that the principles of administrative res judicata preclude defendants from re-opening or reconsidering a prior conclusion.

The United States Supreme Court has applied res judicata to administrative proceedings only when "an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate...." *United States v. Utah Construction Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966). *See generally*, 4 K. Davis, Administrative Law Treatise, § 21.2 (1983). Plaintiffs have not proposed as fact that the National Institutes of Health

---

**3.** Defendants have submitted copies of what they refer to as a Final Version of the Policies and Procedures for Dealing with Possible Misconduct in Extramural Research. This document is dated July 25, 1990. It eliminates many references to "institutions" in its provi-

sions. Defendants have not advised the court of the present status of this Final Version. There is no evidence that the Final Version has been promulgated in conformance with the requirements of the APA.

has made a formal decision on Abbs's alleged misconduct that would satisfy the prerequisites set out in *Utah Construction.*[4] According to their own procedures, defendants' investigation is an "inquiry," which is defined as consisting of "information-gathering and initial fact-finding to determine whether an allegation or apparent instance of misconduct warrants an investigation." 1986 NIH Guide at 8. It is not an adjudication of misconduct.

Plaintiffs suggest that principles of fairness and finality warrant treating the NIH's acceptance of the university's Inquiry Committee determination as the equivalent of a final adjudication, but they do support this suggestion with any argument or citation of authorities.

I conclude that plaintiffs have failed to show their entitlement to the application of res judicata to bar the investigation from proceeding against plaintiff Abbs. Accordingly, I will grant defendants' motion for summary judgment on this claim of plaintiffs' complaint.

### F. Applicability of Administrative Procedure Act Procedures

█ Plaintiffs' final claim is that the NIH determination of misconduct charges is an adjudicatory proceeding subject to the Administrative Procedure Act, and that defendants are required to follow the procedures of the Act in conducting their investigation of plaintiff Abbs. They cite *Wong Yang Sung v. McGrath,* 339 U.S. 33, 50, 70 S.Ct. 445, 454, 94 L.Ed. 616 (1951), for the proposition that the APA is applicable to any hearing necessitated by the Constitution or by statute. Since I have found that plaintiffs have no property or liberty inter-est that is implicated by the defendants' investigation, the Constitution does not require that the APA be followed. Plaintiffs have cited no statutory requirement that the APA's procedures be followed in the investigation of scientific misconduct. However, they have cited *International Telephone & Telegraph Corp. v. Local 134,* 419 U.S. 428, 95 S.Ct. 600, 42 L.Ed.2d 558 (1975), for the proposition that the APA's adjudicatory procedures are applicable to agency process for the formulation of an order that constitutes the final disposition of an agency in a matter. In fact, *International Telephone* holds that § 554 of the Act applies to administrative action that constitutes an "adjudication required by statute to be determined on the record after opportunity for an agency hearing." *Id.* at 442, 95 S.Ct. at 609 (quoting 5 U.S.C. § 554) The investigation of plaintiff Abbs is not such an adjudication.

### ORDER

IT IS ORDERED that plaintiffs' motion for partial summary judgment is GRANTED on the claim that the procedures governing defendants' investigation of plaintiff Abbs were never validly promulgated and defendants' motion for summary judgment is GRANTED with respect to all of plaintiffs' remaining claims; plaintiffs' motion for preliminary injunction is DENIED as moot; and defendants' motion to strike a portion of the affidavit of plaintiffs' attorney is GRANTED. The Clerk of Court is directed to enter final judgment in accordance with this order.

---

**4.** Plaintiffs omitted this issue from their motion for summary judgment, saying they needed additional time for discovery. However, they did have an opportunity to address the claim in response to defendants' motion for summary judgment, and they have failed to show how additional discovery would assist them in proving that a formal decision had been made by NIH before it began the investigation that is the subject of this suit.

Plaintiffs did ask the court to shorten the time for defendants to respond to a request to admit or deny the authenticity of a document in their attorney's possession. I denied the motion on the ground that briefing was over and that it seemed unlikely that the document would be of any significance in determining any claim. I continue to view the document as irrelevant to plaintiffs' challenge. Assuming the document is accurate, it shows only that the National Institutes of Health reviewed the report of Wisconsin's investigation of plaintiff Abbs and concurred with the university's finding that there was no misconduct. It does not show that there was a formal adjudication by a government agency that would support the application of res judicata to a decision of the National Institutes of Health.