In the

# United States Court of Appeals

## For the Seventh Circuit

No. 02-2155

HOME BUILDERS ASSOCIATION
OF GREATER CHICAGO,

*Plaintiff-Appellant*,

*v.*

U.S. ARMY CORPS OF ENGINEERS,
CHICAGO DISTRICT, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 5057—**Rebecca R. Pallmeyer**, *Judge*.

ARGUED OCTOBER 18, 2002—DECIDED JULY 10, 2003

Before POSNER, DIANE P. WOOD, and EVANS, *Circuit Judges*.

DIANE P. WOOD, *Circuit Judge.* Too many cooks can spoil the broth, as everyone knows. But that is only if no one pays any attention to what the other ones are doing. Patrons of fine French restaurants enjoy the cooperative efforts of a team of *chefs de cuisine*, who coordinate both expertise and timing to produce the final product. The same risk of unintended consequences, or worse, chaos, exists within our system of cooperative federalism, in

which authorities at the federal, state, and local levels often have overlapping competence. One area where this risk can materialize is in the regulation of the nation's waterways, where federal and local agencies exercise overlapping jurisdiction and operate concurrent permitting programs. This case is about an attempt to make the most of each participants' efforts, through interagency coordination.

This attempt took the form of an Interagency Coordination Agreement (ICA) among the various agencies responsible for water regulation in Lake County, Illinois. The Chicago District of the U.S. Army Corps of Engineers (Corps), the Lake County Stormwater Management Commission (LCSMC), the Lake County Soil and Water Conservation District (LCSWCD), and the U.S. Department of Agriculture's Natural Resources Conservation Service (NRCS) entered into this agreement in late 1999. Their efforts were not greeted with enthusiasm by at least one group, the Home Builders Association of Greater Chicago (Home Builders), which immediately sued the Corps and a number of its officials for injunctive and declaratory relief on the grounds that the ICA impermissibly extends the statutory and regulatory authority of the Corps under the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, and the Rivers and Harbors Act, 33 U.S.C. §§ 401 *et seq*. In addition, Home Builders alleged that the ICA was adopted without sufficient notice and comment under the Administrative Procedures Act (APA), 5 U.S.C. §§ 701 *et seq*. The district court dismissed the action on the ground that it was nonjusticiable, because Home Builders had not alleged a concrete injury stemming from a final agency action. Home Builders now appeals. We agree with the district court that this suit presents nonjusticiable questions, and we therefore affirm its judgment.

**I**

Section 404 of the Clean Water Act charges the Corps with regulating certain activities affecting the nation's waterways and wetlands. See 33 U.S.C. § 1344; 33 C.F.R. § 320.2(f). The Act is designed to establish a comprehensive program to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To this end, the Act prohibits the discharge of any pollutant, including dredged or fill material, into the navigable waters of the United States unless the discharge is authorized by a permit. *Id*. § 1311(a). The Corps is responsible for administering this permitting regime. *Id*. § 1344. Day-to-day responsibility for administering the § 404 permit program has been further delegated by the Corps to its district and division engineers. 33 C.F.R. § 320.1(a)(2).

The § 404 permit program involves two types of permits. Individual permits are issued on a case-by-case basis, after site-specific documentation and analysis, opportunity for a public hearing, public interest review, and a formal determination. *Id*. §§ 320.4, 323. The Corps evaluates permit applications in light of Environmental Protection Agency (EPA) guidelines for proper erosion and siltation controls, 40 C.F.R. §§ 230.70-230.77, and also with reference to a range of "public interest factors," 33 C.F.R. § 320.4. General permits, by contrast, are nationwide permits and are designed to expedite review of activities having minimal environmental impacts. *Id*. § 330. Failure to comply with the terms of the § 404 permitting regime can expose a party to enforcement action, including civil administrative action initiated by the Corps itself, *id*. § 1319(g), or civil and criminal proceedings upon referral to the Department of Justice, *id*. §§ 326.5, 326.6. This case concerns the case-by-case permits.

Home Builders would like to challenge the Corps' adoption of the ICA itself, which as we noted seeks to co-

ordinate federal regulation of soil erosion and sediment flows under the § 404 permit regime with the work of various federal- and local-level agencies. The ICA represents the Corps' effort to work effectively with its local counterparts, including the LCSMC, which is the primary permitting authority for the administration and enforcement of the stormwater management provisions of Lake County's Watershed Development Ordinance, and the LCSWCD, which is a special district authorized to promote soil and water conservation associated with land disturbance.

The operative provisions of the ICA designed to achieve this goal set forth the following undertakings on the part of the Corps:

   1. Wherever appropriate, as a special condition of a Department of Army authorization, [to] require the permittee to consult with the LCSMC on soil erosion and sediment control plans.

   2. At the Corps['] discretion, the Corps will require the permittee to submit a soil erosion and sediment control plan to the LCSMC for review and approval. The Corps will utilize the plan review comments to determine the adequacy of the applicant's soil erosion and sediment control plan. The Corps will provide notification to the applicant and LCSMC to initiate this process.

   3. At the Corps['] discretion, as a condition of the Department of the Army permit, the Corps will require the permittee to schedule a preconstruction meeting with the LCSMC to review implementation of the soil erosion and sediment control plans.

   4. If the Corps, NRCS, or LCSWCD receives a report of a soil erosion and sediment control issue on a site, the agencies will contact LCSMC. LCSMC will investigate the report and, if necessary, prescribe corrective

action to the property owner or coordinate through the Certified Community . . . . If the LCSMC fails to resolve a violation on an authorized permit site in a timely manner or if LCSMC requests the Corps['] assistance, the Corps will take action as deemed appropriate by the Corps.

5.  [The Corps will r]equest that LCSMC conduct on-site inspections during the active construction phase(s) of land development projects to determine whether site development is in compliance with the approved plan and Corps permit requirements (as those requirements relate to soil erosion and sedimentation control) and determine adjustments needed to the approved plan.

ICA, § IV.A.

The ICA expressly provides that all signatories are to remain independent parties, and that no provision of the agreement should be construed to establish an agency or representative relationship among the parties "for any purpose, or in any manner whatsoever." *Id*. § IV.E.9. Moreover, under the ICA the Corps specifically retains the right to make final decisions regarding opinions, actions, or findings within the Corps' jurisdiction. *Id*. § IV.E.5.

Between September 21, 1998, and April 27, 2001, Home Builders, an umbrella group of some 1,100 residential developers and construction companies, filed three successive complaints. In each, Home Builders sued for injunctive and declaratory relief on the grounds that the ICA impermissibly extends the statutory and regulatory authority of the Corps under the Clean Water Act and the Rivers and Harbors Act and violates the APA because it was adopted without sufficient notice and comment. The district court dismissed all three complaints for lack

of jurisdiction on various ripeness, standing, and finality grounds.

On March 5, 2002, the district court issued its final opinion, in which it considered Home Builders' motion to file a Fourth Amended Complaint. The court evaluated Home Builders' challenges to the provisions of the ICA set forth above in two parts. With respect to the first three provisions, the court found that review was impossible because their discretionary nature precluded a finding of final agency action within the meaning of the APA. The challenge to the fourth and fifth provisions of the agreement failed for lack of a sufficiently concrete injury to support Article III standing. No amendment was going to cure these deficiencies, in the court's view, and so it denied plaintiffs' motion to file the Fourth Amended Complaint and dismissed Home Builders' claims with prejudice. This appeal followed.

## II

Our inquiry in this case begins and ends with the question whether Home Builders has presented a justiciable claim. We review this question, which goes to the existence of federal jurisdiction, *de novo,* looking beyond the pleadings if necessary. *Selbe v. United States*, 130 F.3d 1265, 1266-67 (7th Cir. 1997).

## A

We turn first to the district court's dismissal on finality grounds of Home Builders' challenges to the first three provisions of the ICA. Home Builders is relying on the APA for its right to bring this suit. Where, as here, the actions of the agency are not made reviewable by a specific statute, the APA allows judicial review of the actions by federal agencies only over "final agency action

for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *Abbs v. Sullivan*, 963 F.2d 918, 925-26 (7th Cir. 1992). Even if an action is final, as the term is understood in the APA, review is still unavailable if "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). Courts have interpreted the finality component of "final agency action" in a pragmatic way. See *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967); *Board of Trade v. SEC*, 883 F.2d 525, 530 (7th Cir. 1989).

The most recent Supreme Court word on the test for finality appears in *Bennett v. Spear*, 520 U.S. 154 (1997), where the Court had this to say:

> As a general matter, two conditions must be satisfied for agency action to be considered "final": First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.

*Id.* at 177-78 (citations and quotations omitted); *Western Ill. Home Health Care v. Herman*, 150 F.3d 659, 662 (7th Cir. 1998) (quoting same). Interpreting this language, as well as drawing guidance from earlier decisions of the Court, this court stated that an action is final when "its impact is sufficiently direct and immediate and has a direct effect . . . on day-to-day business." *Western Ill. Home Health*, 150 F.3d at 662 (quoting *Abbott Labs.*, 387 U.S. at 151-52, and *Franklin v. Massachusetts*, 505 U.S. 788, 796-97 (1992)). Accordingly, "[t]he core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Id.* (quoting *Franklin,* 505 U.S. at 797).

In finding that the first three provisions of the ICA were not "final agency action" for APA purposes, the district court focused in particular on the fact that these provisions are framed in discretionary terms and therefore "do not bind the Corps to any particular course of action." If discretion is so complete that meaningful standards for judicial review are lacking, then that would be an unobjectionable ground. Some care is necessary, however, in talking about discretion, because it is equally true that the presence of some discretion in the system does not necessarily defeat the availability of judicial review over other elements. The Supreme Court's decision in *Toilet Goods Association v. Gardner*, 387 U.S. 158 (1967), issued the same day as *Abbott Labs* and widely considered a foundational case in modern administrative law, makes the latter point clear. There, the Supreme Court found "no question" that the regulation at issue was final, even though the regulation stated that the Commissioner of the Food and Drug Administration "may" suspend agency certification in response to particular actions by regulated parties. *Id.* at 162. Later cases from the Supreme Court do not contradict this basic holding. The *Bennett* Court, for example, merely noted that the presence of the imperative "shall" in a challenged regulation was enough to defeat the contention that the action was discretionary and thus non-final. See *Bennett*, 520 U.S. at 175.

Nor do the first three provisions of the ICA fit comfortably within the APA's exclusion of review of agency action that is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The classic example of such an action is an agency's decision not to prosecute. See *Heckler v. Chaney*, 470 U.S. 821, 831 (1985); *United States v. Batchelder*, 442 U.S. 114, 123-24 (1979); *United States v. Nixon*, 418 U.S. 683, 693 (1974). The exception has also been found to apply to situations in which a statute's

delegation of decision-making authority to an agency is so complete "that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Webster v. Doe*, 486 U.S. 592, 600 (1988) (quoting *Heckler*, 470 U.S. at 830); see also *Scalise v. Thornburgh*, 891 F.2d 640, 648-49 (7th Cir. 1989); *Singh v. Moyer*, 867 F.2d 1035, 1037-38 (7th Cir. 1989). This latter version of the exception is a "very narrow" one, see *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), and applies only if a careful analysis of the statutory language, statutory structure, legislative history, and the nature of the agency action requires it. *Singh*, 867 F.2d at 1038.

The ICA does not reflect either type of untrammeled discretion. Home Builders is not challenging a prosecution decision. Nor does the ICA lack language on which we might base our review or leave in doubt the particulars of the procedures that would be required of a prospective permit applicant in any particular instance. Only the frequency of the Corps' invocation of those procedures is in doubt here. But the possibility exists in every case that the Corps may use these procedures, and it is easy enough to see what it has committed itself to do, and thus to find the law that should apply. *Overton Park*, 401 U.S. at 410.

We conclude that the first three provisions of the ICA, though they include substantial discretionary elements, represent a definitive pronouncement of Corps policy, rather than an agency decision "of a merely tentative or interlocutory nature.*" Bennett*, 520 U.S. at 177-78. The language and subject matter of the provisions are such as to indicate that the Corps "has completed its decisionmaking process." *Franklin*, 505 U.S. at 797. Thus, we agree with Home Builders that the ICA meets the first part of the *Bennett* test for finality.

**B**

The second part of the *Bennett* test requires us to decide whether any of the five ICA provisions amount to an agency action by which "rights or obligations have been determined," or from which "legal consequences will flow." As such, it is closely related to the question of ripeness, under which the court must decide (1) whether the issues are fit for judicial decision and (2) what hardship will be inflicted on the parties if court consideration is withheld. See *Nat'l Park Hospitality Ass'n v. Dept. of the Interior*, 123 S.Ct. 2026, 2030 (2003). Because, at least in this case, the concerns underlying those two doctrines are so similar, we analyze Home Builders' claim in the alternative.

First, in order to show that it is attacking a "final" decision, Home Builders notes that the ICA requires its members to shuttle between different regulatory agencies, increasing the inconvenience and the costs of regulatory compliance. But we have held in the past that the mere presence of increased administrative costs is insufficient to establish the finality required for nonstatutory review under the APA. See, *e.g.*, *Abbs*, 963 F.2d at 927 (finding no finality "when the only harm the challenger seeks to avert is the inconvenience of having to go through the administrative process before obtaining a definitive declaration of [her] legal rights"); see also *FTC v. Standard Oil of Cal.*, 449 U.S. 232, 242 (1980) (noting that complying with additional administrative proceedings "is different in kind and legal effect from the burdens attending what heretofore has been considered to be final agency action"). To the extent that the ICA imposes additional administrative costs on regulated parties, those costs do not make the adoption of the ICA a final agency action within the meaning of the APA.

The same is true of Home Builders' claim that the ICA injures its members by imposing "delays" in the

permitting process. As a general rule, § 706 of the APA "leaves in the courts the discretion to decide whether agency delay is unreasonable." *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999). Among the circuits that have considered the question, the consensus is that agency delay in face of a clear statutory duty (but in the absence of a statutory deadline) must be "egregious" before it can convert agency inaction into a final action reviewable under the APA or warrant mandamus. See, *e.g.*, *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001); *In re Cal. Power Exchange Corp.*, 245 F.3d 1110, 1124 (9th Cir. 2001); see also *Forest Guardians*, 174 F.3d at 1190. We agree with that assessment. Home Builders is complaining only about alleged minor delays that might occur because of the additional procedural hurdles imposed by the ICA. This is not enough to satisfy the second part of the *Bennett* test.

In fact, it is quite unclear whether the ICA has or will impose any additional costs or delays on permit applicants at all. On its face, the ICA does two things. First, it sets up rules that govern the sequence in which permit applicants approach local and federal agencies: the applicant must submit its materials to local-level agencies and only then may it go to the Corps (provisions 1, 2, and 3). Second, the Agreement amounts to a *de facto* outsourcing arrangement. The ICA specifies that the Corps may rely on formal LCSMC comments on plans presented at the local level in making federal permitting decisions (provisions 2 and 3), and that the LCSMC will in some cases perform inspections that would otherwise be conducted by the Corps itself (provisions 4 and 5).

It seems possible to us that the ICA may actually reduce, rather than increase, the costs and delays of the permitting process. In the absence of the ICA, regulated parties would still have to acquire permits from both federal and local authorities before commencing construction or

other projects. The ICA may streamline the process by subjecting permit applicants to one set of inspections and by requiring that applicants submit only one set of application materials for formal comment, thus avoiding duplication of effort. Of course, whether the ICA in fact imposes additional costs or delays is irrelevant, given our holding that neither amounts to legal consequences within the meaning of the APA's finality requirement. But the fact that the existence of greater costs and delays is speculative at best bolsters our conclusion that Home Builders has not shown the legal consequences necessary to maintain its suit.

We turn next to Home Builders' contention that the ICA subjects its members to "conflicting requirements." To the extent that Home Builders is claiming that the conflicting requirements imposed by the federal and local signatories to the ICA impose administrative burdens on its members who are seeking regulatory approval, this simply restates the allegation about heightened compliance costs and delay, and it fails for the same reasons. To the extent Home Builders' claim is that the ICA itself adds new "conflicting requirements" that prospective permitees must satisfy, the short answer is that it does no such thing. The source of those conflicting requirements, to the extent they exist, is in the congressional decision in the Clean Water Act to establish a partnership between the States and the Federal Government, not the ICA. See 33 U.S.C. § 1251(g); see also *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992). The Clean Water Act explicitly contemplates more stringent regulation of the discharge of effluent material by state and local governments than that required by the federal government, at least as to waters subject to joint federal-state jurisdiction. See 33 U.S.C. § 1342(b); 40 C.F.R. § 122.1(a)(5); see also *International Paper Co. v. Ouellette*, 479 U.S. 481, 489-90 (1987) (interpreting 40 C.F.R. § 122.1(f), the

predecessor implementing regulation). The upshot of all of this is that the Clean Water Act's permitting provisions, like many federal regulatory laws, establish a floor, but not a ceiling, on state and local regulation. See, *e.g.*, *California Federal Sav. and Loan Ass'n v. Guerra*, 479 U.S. 272, 285 (1987). Thus, the "conflicting requirements" that Home Builders is attacking are a pervasive feature of the regulatory landscape, not something that the ICA created.

Home Builders finally urges us to find that the Corps is using the ICA as a means of improperly leveraging its regulatory authority beyond that given it by Congress. By this, it appears to be accusing the Corps of imposing requirements that go beyond the restrictions authorized by federal law. If that were true, it would be a serious point. But we are entitled to look at the ICA itself to see if it can be used in this way, see *Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983, 990 (7th Cir. 2000), and our review convinces us that it cannot.

This would be a different case if Home Builders had tendered evidence that the Corps had rejected a federal permit application solely because the applicant had not complied with a local agency's requirements regarding non-navigable waters. See, *e.g.*, *Solid Waste Agency of N. Cook County v. U.S. Army Corp of Eng'rs*, 531 U.S. 159, 171-72 (2001). Upholding such a condition would allow the Corps to graft onto the permitting process additional requirements that are not within its regulatory authority. But if Home Builders wished to make such an argument in this case, it would not need to refer to the ICA. It would be enough to allege, and show, that the Corps was acting *ultra vires*–that is, outside the authority conferred upon it by Congress.

This is precisely what the plaintiff succeeded in demonstrating in the Fifth Circuit decision upon which Home Builders relies, *American Forest and Paper Association v.*

*EPA*, 137 F.3d 291 (5th Cir. 1998). In *American Forest*, the plaintiff sought review of an EPA rule providing for veto of all permits granted by Louisiana state authorities that did not comply with the Endangered Species Act (ESA). Prior to its promulgation of the challenged rule, the EPA had itself administered the permitting program and had ensured that the proposals submitted by permit applicants complied with the ESA. But by its express terms, the ESA does not apply to state-level actors. In order to get around this fact, when the EPA delegated its permitting authority to Louisiana it did so on the condition that the state agency in charge of permitting submit all permit applications to two federal agencies—the Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS)—for final approval under the ESA. The Association sued, and the EPA argued that the Association lacked standing, and that the dispute was not yet ripe. The Fifth Circuit rejected both of these arguments. It found that the EPA had acted beyond its statutory authority by imposing a criterion—*i.e.*, the protection of endangered species—that is not enumerated among the factors that the Clean Water Act allows the EPA to take into account in granting or denying approval of state permitting programs. *Id.* at 299.

But the ICA is quite different from the EPA rule at issue in *American Forest*. It is more like the agency action challenged in this court's case of *Abbs v. Sullivan*. In *Abbs*, a state university professor sought to challenge the procedural framework used by the National Institutes of Health to investigate alleged improprieties in the use of an NIH grant. 963 F.2d at 921. We rejected his challenge to the NIH's procedural framework on finality grounds, drawing a loose distinction between rules of conduct and rules of procedure. *Id.* at 926. As we have found above with respect to the ICA, there was no indication that Abbs had suffered, or would suffer, concrete harm as a consequence of his case winding its way through

the procedural framework set up by the NIH. *Id.* We concluded that, short of an actual finding of guilt and the imposition of sanctions, Abbs was only challenging a "set of rules governing the investigation," and not agency action itself. *Id.*

The ICA is also similar in a number of respects to the broad program found to lack finality for APA purposes in *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990). In *Lujan,* the National Wildlife Federation challenged the "land withdrawal review program" of the Bureau of Land Management (BLM). The "program" in fact set forth a procedural framework for determining the status of public land and its availability for private uses such as mining. *Id.* at 878-79. The Court held that the program was not an "identifiable agency action" because it did not "refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations," but instead was "simply the name by which petitioners have occasionally referred to the continuing . . . operations of the BLM." *Id.* at 890. Accordingly, the Court found that the procedural framework for determining possible private uses lacked the finality necessary for nonstatutory review under the APA. *Id.* at 890-91.

As in *Lujan* and *Abbs*, the ICA establishes only the procedural framework under which the Corps intends to operate. It expressly provides that the Corps retains the right to make final decisions regarding opinions, actions, or findings within the Corps' jurisdiction. What the ICA does not do, and what distinguishes it from the EPA rule that was successfully challenged in *American Forest*, is impose new legal requirements on regulated parties, or alter in any way the legal regime to which Home Builders' members are subject. So long as the Corps does not use the ICA to leverage its regulatory authority beyond that provided for by statute, there is no agency action

by which "rights or obligations have been determined," or from which "legal consequences will flow."

It would not help Home Builders even if we were to agree that the entry into force of the ICA was a "final" agency action under *Bennett*, because this would simply shift our inquiry to ripeness. In *National Park Hospitality Association*, *supra*, the Supreme Court began by noting that "the question of ripeness may be considered on a court's own motion." 123 S.Ct. at 2030. In that case, the Court held that a National Park Service regulation that purported to render the Contracts Disputes Act of 1978, 41 U.S.C. §§ 601 *et seq.*, inapplicable to concession contracts on parklands was not ripe for review. The regulation, which was nothing more than a general statement of policy, did not create adverse effects of a strictly legal kind. 123 S.Ct. at 2031. It did not affect the concessioner's primary conduct. *Id.* Indeed, nothing seemed to prevent concessioners in particular cases from following the procedures of the Contract Disputes Act. *Id.* Under the circumstances, the Court concluded, the challengers had not shown the type of hardship needed to create a dispute ripe for resolution. Evaluating the harm from delayed consideration, the Court found that further factual development would significantly advance its ability to deal with the legal issues. *Id.* at 2032. Accordingly, it decided that the case had to be dismissed on ripeness grounds.

This analysis is tailor-made for Home Builders' challenge to the ICA. Like the Park Service regulation, the ICA is only a general statement of policy. It creates no legal rights or obligations affecting primary conduct. It may be that in particular cases the Corps will choose not to follow its procedures. Finally, further factual development would substantially assist in any court's evaluation of the agreement. We do not even know, at this point, whether it will have the desired streamlining effect, or if it will result in the onerous costs and delays that Home

Builders fears. Thus, on the assumption that the ICA can clear the finality hurdle, we find that Home Builders' suit is not ripe for resolution.

C

Two more loose ends remain. Home Builders contends that the Corps lacked statutory authority to enter into the ICA in the first place and that this supports a facial challenge to the Agreement. But to prevail on a facial challenge, Home Builders "must establish that no set of circumstances exists under which the [regulation] would be valid." *Reno v. Flores*, 507 U.S. 292, 301 (1993) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

Home Builders' complaint does not meet that demanding standard. Its principal claim, which is that the Clean Water Act's implementing regulations authorize the Corps to execute joint-procedures agreements with States and other federal agencies only, and not with local agencies like LCSMC and LCSWCD, is without merit. Home Builders refers us to 33 C.F.R. § 325.2(e)(3), which states that "[d]ivision and district engineers are authorized and encouraged to develop joint procedures with states and other Federal agencies with ongoing permit programs for activities also regulated by the [Corps]." But that provision does not stand alone. We note in particular 33 C.F.R. § 325.4(a)(2), which says that "[w]here appropriate, the district engineer may take into account the existence of controls imposed under other federal, state, or local programs which would achieve the objective of the desired condition." *Id*. In the face of that language, it is impossible to maintain that there is no set of circumstances under which coordination with local authorities is permissible.

Finally, because we have found that Home Builders is not entitled to bring this action under the APA, we have

no need to consider whether the district court correctly concluded that it lacked constitutional standing to challenge paragraphs four and five of the relevant part of the ICA.

### III

For the foregoing reasons, we AFFIRM the judgment of the district court dismissing Home Builders' complaint and denying leave to amend.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*